IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RUDOLF SKUBELLA
Individually And On Behalf of All
Others Similarly Situated,

    Plaintiff,

      v.

                          CIVIL ACTION FILE
                          NO. 1:07-CV-796-TWT

CHECKFREE CORPORATION, et al.,

    Defendants.

## ORDER

This is a securities fraud class action. It is before the Court on the Defendants'

Motion to Dismiss [Doc. 39].  For reasons stated below, the motion is GRANTED.

I. <u>General Background</u>

The Amended Complaint[1] – brought by the Lead Plaintiff Southwest Carpenters Pension Trust, individually and on behalf of a proposed class that purchased publicly traded securities of CheckFree Corporation stock (NASDAQ: CKFR) between April 25, 2006, and October 24, 2006 – alleges that CheckFree, Peter J. Kight (Chief Executive Officer), and David Mangum (Chief Financial Officer), committed securities fraud in violation of the Securities Exchange Act of 1934.    CheckFree is an electronic payment processing company.  According to its website, it provides "financial electronic commerce products and services."  Am. Compl. ¶ 26.  Kight, the CEO, founded CheckFree in 1981.    During the class period, Mangum was CheckFree's Executive Vice President and CFO, and was "responsible for all financial operations of the company." Am. Compl. ¶ 19.  CheckFree's E-Commerce Division is the company's most important business segment.  It accounted for approximately 75% of the company's consolidated revenues.   Am. Compl. ¶ 30. The Plaintiff

---

[1]The case was initially filed on April 10, 2007, by Rudolf Skubella, on behalf of a proposed class of all purchasers of publicly traded CheckFree securities between April 4, 2006, and August 1, 2006.  On April 27, 2007, Brad Gattelaro, individually and on behalf of those who purchased CheckFree securities between April 4, 2006, and August 1, 2006, filed an identical action. Gattelaro v. CheckFree Corp., No. 1:07-CV-0945-TWT. Doc. 1 (N.D. Ga. April 27, 2007).  On June 29, 2007, the cases were consolidated and Southwest Carpenters Pension Trust's Motion for Appointment as Lead Plaintiff was granted under the authority of § 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act.

contends that CheckFree committed accounting fraud in order to mask the fact that CheckFree's E-Commerce transaction volume was declining.

On April 25, 2006, the Defendants reported what the Plaintiff contends were inflated third quarter results.  During a conference call with analysts, CheckFree assured the investment community that transaction volume was increasing, and that investors could expect continued growth in the E-Commerce Division by about 5-8% in the upcoming fourth quarter.  But by March 2006, the Plaintiff alleges that CheckFree's E-Commerce Division was experiencing declining transaction volume. The Plaintiff alleges that CheckFree's misrepresentations propelled its stock price to a closing price high of $56.35 on May 9, 2006.  Meanwhile, Kight unloaded approximately 350,000 shares of CheckFree stock for a profit of about $16 million.

On August 1, 2006, CheckFree reported its fourth quarter financial results. CheckFree's E-Commerce Division had only grown by 3%, and within the E-Commerce Division, CheckFree's "Payment Services" business declined by 2%.  The Plaintiff contends that the CheckFree offered "vague, evasive, and deceptive" excuses for CheckFree's poor fourth quarter numbers.  Am. Compl. ¶ 8.  The Defendants never disclosed that they were aware that CheckFree's third quarter numbers were artificially inflated, and in a conference, Kight feigned ignorance as to why CheckFree failed to live up to market expectations.  The stock price subsequently fell from the

August 1, 2006 closing price of $43.13 to a low of $37.20 on August 2, 2006. According to the Plaintiff, Kight began to come clean in an October 24, 2006 conference call with analysts. In a series of statements, he admitted that the third quarter numbers appeared stronger than they were due to calendar anomalies and idiosyncrasies in CheckFree's accounting practices. Again, CheckFree stock took a hit. The stock went from $43.51 on October 24, 2006, to as low as $36.63 on October 25, 2006.

## II.  Motion to Dismiss Standard

Normally, a complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a plausible claim for relief. Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1965-66 (2007); Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983). However, complaints that allege fraud must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires that in alleging fraud the circumstances constituting fraud must be stated with particularity. "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the

time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1347 (N.D. Ga. 2000) (citing Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)).

Furthermore, the Private Securities Litigation Reform Act of 1995 requires plaintiffs to plead securities fraud with an added layer of exacting particularity.  Under the Reform Act's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U. S. C. § 78u-4(b)(2).  Failure to do so requires dismissal. "In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met."  15 U.S.C. § 78u-4(b)(3)(A).

 In order to prevail in a securities fraud case, a private plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976).

In Tellabs, Inc. v. Makor Issues & Rights Ltd., 127 S. Ct. 2499, 2504 (2007), the Supreme Court recently considered the Reform Act's requirement for pleading scienter.  In resolving a circuit split, the Court said that "[i]t does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind."  Id. at 2504.  The Court held that "an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id. at 2504-05.  This is a considerable alteration of the landscape in securities fraud cases.

In ruling on a motion to dismiss, the court may consider evidence outside the pleadings so long as the plaintiff relies on it, and its authenticity has not been questioned.  Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999); Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997). Additionally, the Eleventh Circuit authorizes district courts to judicially notice any relevant documents publicly filed with the SEC.  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999).  Therefore, such evidence will be considered when relevant.  See Sturm v. Marriott Marquis Corp., 85 F. Supp. 2d 1356, 1365-66 (N. D. Ga. 2000).

## III. Discussion

Section 10(b) of the Securities Exchange Act of 1934 prohibits any person from using, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe.  15 U.S.C. § 78j(b).  Pursuant to this statutory authority, the SEC adopted Rule 10b-5 which makes it illegal: "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."  17 CFR §240.10b-5.

"To state a securities fraud claim under Rule 10b-5, a plaintiff must allege that the defendant (a) made a misstatement or omission, (b) of material fact, (c) with scienter, (d) in connection with the purchase or sale of securities, (e) upon which the plaintiff relied, (f) that proximately caused the plaintiff's injury."  In re Theragenices Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1347 (N.D. Ga. 2000).

A.  <u>False Statements</u>

The Amended Complaint contains the usual boilerplate recitations as well as a lot of irrelevant material such as quotes from securities analysts and newspaper articles.  In the final analysis, however, this is an accounting fraud case.  If there is no accounting fraud, there is no fraud.  On May 9, 2006, CheckFree filed its interim third quarter financial report on Form 10-Q for the quarter ending March 31, 2006.  The form contained the following relevant statements:

1.    Through our Electronic Commerce Division, we enable consumers to receive and pay bills electronically.  For the three- and nine-month periods ended March 31, 2006, we processed more than 293 million and 830 million payment transactions, respectively, and delivered almost 47 million and 135 million electronic bills ("e-Bills"), respectively.  Am. Compl. ¶ 73.

2.    Our Electronic Commerce Division accounted for approximately 75% of our consolidated revenues in both the three- and nine-month periods ended March 31, 2006.  Am. Compl. ¶ 73.

3.    [O]ur consolidated revenue grew by approximately 20% to $226.9 million in the quarter ended March 31, 2006, from $189.2 million the same period last year.  For the quarter ended March 31, 2006, we earned net income from continuing

operations of $32.2 million, an increase of 110% compared to the $15.4 million earned in the quarter ended March 31, 2005.  Am. Compl. ¶ 73.

4.     Our Electronic Commerce Division experienced revenue growth of approximately 15% for the quarter ended March 31, 2006, compared to the quarter ended March 31, 2005.  Am. Compl. ¶ 73.

5.     Transaction growth exceeded 25% in the third quarter of fiscal 2006 as compared to the same period last year, and sequential quarterly transactions growth was 8%, due in part from the addition of more than 4 million telephone-based payment transactions results from our January 2006 acquisition of PhoneCharge, Inc. ("PhoneCharge").  Am. Compl. ¶ 73.

6.     [W]e delivered almost 47 million e-Bills in the quarter ended March 31, 2006, compared to nearly 37 million in the quarter ended March 31, 2005.  Am. Compl. ¶ 73.

7.     In our Electronic Commerce business, we processed more than 293 million transactions in the quarter ended March 31, 2006; an increase of approximately 59 million transactions, or 25% over the more than 234 million transactions processed in the quarter ended March 31, 2005 . . .

8.     We also delivered almost 47 million e-Bills in the quarter ended March 31, 2005. Am. Compl. ¶ 73.

Similar statements were made earlier in an April 25, 2006 press release and conference call.  The Plaintiff contends that these statements were false or misleading because the third quarter numbers improperly recognized revenue that should have been credited towards the fourth quarter.  Am. Compl. ¶ 78.  The Plaintiff contends that CheckFree's artificially inflated numbers allowed it to hide the fact that transaction revenues, a key indicator of the company's economic well-being, were declining.  Am. Compl. ¶ 78.

The Defendants deny that any of the statements were false.  The Defendants argue that the Amended Complaint's allegations of "improper revenue recognition" fail to explain how CheckFree's practices violated GAAP principles or any of the company's internal policies.  See In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1417-18 (3d Cir. 1997) ("[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data."); see also Carley Capital Group v. Deloitte & Touche, LLP, 27 F. Supp. 2d 1324, 1335 (N.D. Ga. 1998) ("To state a claim for accounting fraud, a plaintiff must adequately plead facts sufficient to support a conclusion that the defendant prepared false financial statements, and that the alleged financial fraud was material.").

The Amended Complaint alleges that the Defendants violated GAAP and internal revenue recognition policies by improperly pulling transactions and revenue from the fourth quarter of 2006 into the third quarter.  The Plaintiff argues that the Defendants admitted the improper revenue recognition during the company's October 24, 2006 conference call with analysts where Kight attempted to explain away the company's relatively weak fourth quarter numbers:

> It is naturally a strong calendar quarter based on the cyclical nature of calendar Q1 and Q4 being the strong transaction quarters and actually stealing transactions from the two middle quarters.  The issue with the March quarter having an even a stronger [sic] is the fact that **there were two anomalies that actually pulled a significant volume of transactions out of Q4 into Q3 to create that 9% [sequential transaction growth].  One was the fact that April started on two-non-processing days and the way our processing system works it will essentially process those transactions and count them in March.**
>
> **So it counts two full days of Q4 into Q3.**  Added to the fact that processing change with our major institution client was a processing change that left at the beginning of the quarter in January all the transaction volume in the quarter that processing change went into place and that processing change **actually pulled additional transactions out of those first two days of April and pulled them into March**.
>
> So we ended up with both a calendar and a processing anomaly on top of what is, as I'm describing, a natural calendar cyclicality that makes the last calendar quarter of the year and the first calendar quarter of the year the strongest transaction quarters and **we end up with a big quarter that makes the April or Q4 quarter look even lower**.  Am. Compl. ¶ 99 (emphasis in original).

The Plaintiff argues that this statement is an "admission" that CheckFree improperly recognized revenue. It is not. Furthermore, there are no specific allegations that either Kight or Mangum knew in April or May of 2006 that the third quarter numbers were improperly inflated by transactions that should have been included in the fourth quarter.

The Plaintiff alleges that the Defendants processed transactions prematurely in the third quarter, recognizing revenue prematurely in violation of GAAP and company policy. It is undisputed that CheckFree processed some payments on March 31 that would have gone into the fourth quarter but for the weekend. According to the Defendants, it did this because in situations where a customer authorized payment on April 1, and that day happened to fall on a Saturday, CheckFree instead processed the payment on Friday, March 31.

In response, the Plaintiff contends that CheckFree recognized transactions and revenues before services were actually performed in violation of company policy. (Pl.'s Resp. to Mot. to Dismiss, at 6 n.8.) CheckFree has a policy of only recognizing revenue when the services have been performed. In fact, the Defendants point the Court to "CheckFree, Inc. Form 10K filed with the SEC for the Year Ended June 30, 2005, at 71," which states "We recognize revenues when the services have been performed." (Defs.' Reply in Supp. of Mot. to Dismiss, at 6, Ex. B.) The Plaintiff

argues that even if the payments were processed on the Friday at the end of the third economic quarter, "the transactions were for payment during Q4, were unsettled, and would not result in recognizable revenue until the next quarter." This specific argument, rather than the general allegation that revenue recognition was improper, does not appear to be in the Amended Complaint, and if it is, the Response certainly does not cite to it. (Pl.'s Resp. to Mot. to Dismiss, at 6 n.8.) The Plaintiff further contends that CheckFree recognized revenue when the services were "processed," rather than when the services were "performed." (Pl.'s Resp. to Mot. to Dismiss, at 6 n.8.) This appears to be a distinction without a difference. The Amended Complaint makes no mention of the distinction between "processing" and "performing" services. The Plaintiff has failed to show that any of the statements relating to third quarter transaction volumes, revenues, or income were false.

The Defendants further contend that even if the third quarter revenue statement was false, it was not materially misleading. A misrepresentation or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). On a motion to dismiss, it is difficult to gauge how a reasonable investor would have reacted. "A complaint may not be dismissed pursuant to Fed. R.

Civ. P. 12(b)(6) unless the alleged misstatements and omissions are 'so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the

question of their importance.'" In re Theragenices Corp. Securities Litigation, 105 F.

Supp. 2d at 1359 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

It is undisputed that CheckFree's CEO thought that the amount of revenue displaced

by the calendar anomalies was big enough to warrant referencing it in an explanation

of why fourth quarter numbers failed to meet expectations.  Kight admits that this case

deals with "the fact that there were two anomalies that actually pulled a **significant

volume of transactions** out of Q4 into Q3, . . ."  Am. Compl. ¶ 99.  A misleading

statement is material where it involves a "significant volume" of transactions.

    B.  Forward-Looking Statements

    The Defendants also contend that the Amended Complaint should be dismissed

because it is dependent on allegations that are protected by the PSLRA's safe harbor

for forward-looking statements.   Under the PSLRA, forward-looking statements[2]

---

[2]The PSLRA defines a "forward-looking statement" as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

cannot form the basis for liability if they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u-5(c)(1)(A)(i). Even if the statement has no cautionary language, the plaintiff must prove that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u-5(c)(1)(B); <u>Harris v. Ivax Corp.</u>, 182 F.3d 799, 807 (11th Cir. 1999).

First, the Defendants contends that several statements in the April 25, 2006 press release were forward-looking. The April 25, 2006 press release includes both forward-looking projections as well as statements of historical fact:

---

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

(1)     "[CheckFree] also reported that its Electronic Commerce division processed 293.3 million transactions, an 8 percent sequential increase over the second quarter of fiscal 2006, . . ." Am. Compl. ¶ 65.

(2)     Kight quoted in the press release as saying, "CheckFree executed well in each of our operating units during the third quarter."  Am. Compl. ¶ 65.

(3)     Kight noting that, "[I]n Electronic Commerce, transactions processed saw consistent growth month-over-month, . . ."  Am. Compl. ¶ 65.

(4)     Mangum noting that, "Based on strong year-to-date results, we have raised our expectations for the Company's consolidated performance."

(5)     Magnum going on to say that, "For the fourth quarter of fiscal 2006, we expect revenue in the range of $226 million to $231 million, . . ."  Am. Compl. ¶ 65.

Furthermore, statements made during the April 25, 2006 conference call are at issue.  The following are Kight's statements:

(1)     "[W]e reported strong performance across the board." Am. Compl. ¶ 66.

(2)     "In our Electronic Commerce division, we processed 293.3 million transactions during the quarter, representing an 8% sequential quarterly growth." Am. Compl. ¶ 66.

(3)      "I am clearly pleased with our execution in the third quarter . . ." Am. Compl. ¶ 66.

(4)     "Overall, I am clearly pleased with the quality of our execution in the third quarter and throughout this year." Am. Compl. ¶ 68.

(5)     "The quality of our execution this year, I think, positioned us into a position of relative strength, one that, I view, allows us to increase investment in the areas that will position us well for future growth."  Am. Compl. ¶ 68.

Magnum's relevant statements are as follows:

(1)     "Total business performance exceeded our expectations in the third quarter . . ." Am. Compl. ¶ 67.

(2)     "In Electronic Commerce, we expect sequential transaction growth of 5 to 8% [during the fourth quarter]." Am. Compl. ¶ 67.

(3)     "In Electronic Commerce we reported transaction growth of 8% at the high end of our expectations." Am. Compl. ¶ 67.

(4)     "We are increasing our full year financial expectations, based on our strong overall performance year-to-date."  Am. Compl. ¶ 67.

On September 8, 2006, the company filed its annual report on Form 10-K for the fiscal year ending June 30, 2006.  Kight and Magnum each signed the 2006 10-K, which contained statements similar to the ones at issue in the press release and conference call described above.  Am. Compl. ¶ 94.

The Defendants do not contend that the May 9, 2006 interim quarterly financial report 10-Q for the quarter ending March 31, 2006, was forward-looking.  Rather, they contend that the April 25, 2006 press release and conference call were forward-looking.  The third quarter numbers themselves cannot be protected by the safe harbor as the PSLRA excludes statements "included in a financial statement prepared in accordance with generally accepted accounting principles."   15 U.S.C. § 78u-5(b)(2)(A).  It is undisputed that the projections about fourth quarter revenue were forward-looking.

Although the Plaintiff argues that any statements that retrospectively refer to third quarter performance, if made in the context of a forward-looking projection, magically transforms the entire statement into one that is not forward-looking, Eleventh Circuit precedent appears to have foreclosed that line of argument.  See Harris v. Ivax, 182 F.3d 799, 806 (11th Cir. 1999) ("If the allegation is that the whole list is misleading, then it makes no sense to slice the list into separate sentences. Rather, the list becomes a "statement" in the statutory sense, and a basis of liability, as a unit. It must therefore be either forward-looking or not forward-looking in its entirety."); Barr v. Matria Healthcare, Inc., 324 F. Supp. 2d 1369, 1381 (N.D. Ga. 2004) ("[T]he Court of Appeals for the Eleventh Circuit recognized that barring mixed

statements of fact and projection from the safe harbor would inhibit corporate officers from fully explaining corporate outlooks to shareholders or to the public.").

With respect to the fourth quarter projections, the Defendants contend that they included meaningful cautionary language with their forward-looking statements. In order for a cautionary statement to be meaningful, it must mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). This does not require a Nostradamus-like warning of the exact event that occurred. See Harris, 182 F.3d at 807 ("It does not require a listing of all factors."). A cautionary statement is meaningful if it is enough to put a reasonable investor on notice of the type of harm the investor suffered. Id. ("[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.")

The April 25, 2006 press release specifically cautioned that the risks and uncertainties in the company's periodic reports "could cause actual results to differ materially from plans and projections." (Defs.' Mot. to Dismiss, at 14-15.) Mangum opened the April 25, 2006 conference with the same warning, "Before we start, please note that some of the statements we will make today will not be historical, but rather

forward-looking statements . . . CheckFree's actual results may differ from these current expectations.    Forward-looking  statements  involve  various  risks  and uncertainties."  (Defs.' Mot. to Dismiss, at 14-15.)  (citing Ex. D, Tr. of Q3 Earnings Call, April 25, 2006).

In addition, the Defendants specifically designated their statements regarding transactional volume and earnings for the fourth quarter in the press release and conference call as "forward-looking," and "therefore, uncertain due to the risk factors explained in the Company's periodic reports."  (Defs.' Mot. to Dismiss, at 14-15.) (citing Ex. C, Press Release, April 25, 2006; Ex. D, Tr. of Q3 Earnings Call, April 25, 2006.)  In addition, the Defendants point to two sections of the Form 10-K, referenced in the press release and the conference call, which state:

(1)    "If the number of electronic commerce transactions does not continue to grow . . . , it could have a material adverse effect on our business, financial condition and results of operations."  (Ex. E, Form 10-K for Fiscal Year Ended June 30, 2005, at 13.)

(2)    "[I]n our Electronic Commerce Division, we often experience fluctuations in transactional volume and revenue on a quarterly basis."  (Ex. E, Form 10-K for Fiscal Year Ended June 30, 2005, at 18.)

These statements are all entitled to safe harbor protection.

C.  Scdienter

The PSLRA requires plaintiffs to particularly plead facts showing scienter. Tellabs, 127 S. Ct. at 2504.  The plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  As noted above, the Supreme Court has recently clarified this requirement by defining a "strong inference" as one that "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 2504-05.  A complaint may survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510.  The allegations of scienter must be evaluated in the context of the totality of allegations put forth in the entire complaint. Id. at 2511.  "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 2511.

At a minimum, the Plaintiff's allegations must result in an inference of "severe recklessness." In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d at 1359. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but

an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." <u>McDonald v. Alan Bush Brokerage Co.</u>, 863 F.2d 809, 814 (11th Cir. 1989) (citations and quotations omitted).

 In response to the boilerplate allegations of the Amended Complaint, the Defendants have a specific and straightforward response to the claim that they falsified the third quarter financial reports.  They say that the two days of transactions were processed on Friday (the last day of the third quarter) because they could not be processed on the weekend; and that this occurred as a result of the routine business practice of CheckFree.  The Defendants' explanation for what happened makes a lot of sense.  The Plaintiff has not come forward with any facts to contradict the Defendants' claim.  The Plaintiff has not alleged any specific facts implicating Kight or Mangum in making the decision (if there was one) to process the weekend transactions on Friday.  Other than boilerplate allegations that the Defendants had access to reports about transaction volumes, the Plaintiff does not even allege that Kight or Mangum knew about it at the time.  The CEO will not win any awards for his bumbling explanations months later for what happened in the third and fourth quarters.  But at this point in time, the inference of fraudulent intent is not cogent and it is not as compelling as the opposing inference of nonfraudulent intent.  In other

words, the Amended Complaint fails the <u>Tellabs</u> test.  Looking at the totality of the situation – ignoring the boilerplate recitations endemic to these types of pleadings – this appears to be a fairly common case of an over hyped stock, slower growth for a couple of quarters, and a predictable market reaction by investors and analysts obsessed with short term numbers.  This is not an accounting fraud case.

## IV.  Conclusion

For reasons stated above, the Defendants' Motion to Dismiss [Doc. 39] is GRANTED.  The Plaintiff has 30 days from the docketing of this Order to file an Amended Complaint which complies with the pleading requirements of the Reform Act and <u>Tellabs</u>.  A courtesy copy of a redlined version of the Amended Complaint should be delivered to chambers.  If no Amended Complaint is filed, this dismissal becomes a dismissal with prejudice.

SO ORDERED, this 25 day of April, 2008.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge